1WICKER, Judge.
Jorge R. Diaz was charged by bill of information along with other defendants with knowingly causing or participating in a vehicular collision for the purpose of presenting a false or fraudulent claim with the intent to injure, defraud, or deceive an insurance company in violation of La.R.S.22:1244 (A)(1).[1]
Diaz filed a motion to quash pursuant to La.Code Crim. P. art. 531[2] alleging [2that all of the evidence against him was illegally seized from the offices of the Gilsburg & Associates Law Firm and the West Espla *1194 nade Treatment Center in violation of his attorney-client privilege. He also filed a motion to suppress all evidence obtained from these two offices and all evidence subsequently obtained directly or indirectly from the evidence recovered from the offices. The trial judge did not rule on the motion to suppress since the state argued it did not have any physical evidence or any statement by Diaz it was introducing. Defense counsel clarified that he had no response to the motion to suppress based on his understanding that the state did not intend to introduce any physical evidence which would include any documents or any statement made by Diaz. The trial judge denied the motion to quash. Diaz reurged his |3motion to quash and the trial judge denied the second motion as untimely. The jury found Diaz guilty as charged. He was sentenced to three years at hard labor with credit for time served. Diaz now appeals. We affirm the conviction and sentence.
On appeal Diaz assigns the following errors:
1. The trial court erred by denying appellant’s motions to quash, motion to suppress evidence and the new trial based on the lack of an evidentiary hearing- required under State v. Bright, 96-0280 (La.App. 4 Cir. 6/12/96), 676 So.2d 189 to determine if a violation of the attorney-client privilege existed when confidential information was obtained from the paralegal of appellant’s civil attorney and used as evidence at the appellant’s criminal trial.
2. Insufficiency of the evidence.
3. Excessiveness of the sentence.
The testimony at trial revealed the following. Gregory Price Avengno (Avengno) testified as follows. On January 5,1996 he was in an accident while driving alone in his automobile. He saw two white cars ahead of him. He observed the driver of the first of the two cars attempt to make an illegal left turn onto the turning lane on the opposite side of the highway. The driver of the second white ear, whom he identified in court as Diaz, slammed his brakes. Avengno noted a car on his right side which prevented him from getting into the next lane in order to avoid the accident. Avengno was blocked at the left side as well by the neutral- ground. Avengno slammed his brakes and struck the back of the white car driven by Diaz. He stated the impact was light. The driver of the first white car did not make the illegal turn. The driver went straight ahead and ■left the scene. At the time of the accident Avengno and Diaz agreed that the driver of the first white car caused the accident. However, Avengno also testified that all of the other drivers were driving in unison.
Clayton Rives (Rives), an employee of the Attorney General’s Office, testified that he joined a task force in March 1996 to investigate insurance fraud. The task force was formed in January 1996 and investigated staged accidents in Jefferson Parish. Initially Jeff Newland, a State Farm Insurance representative, brought the matter to their attention. Rives explained the agent had a relative involved in an accident and as he looked over the accident he realized he had processed claims through the firm of Gils-burg & Associates for claimants treated at West Esplanade Treatment Center. The agent’s suspicions were aroused since the accidents were low impact rear-end collisions involving individuals of Hispanic descent. The agent filed a complaint Uwith the National Insurance Crime Bureau after, observing the pattern.
Rives stated that all of the accidents investigated were low impact rear-end collisions occurring mostly in the Kenner-Metairie area. The claimants were all going to the same law firm and chiropractic clinic. The task force began looking at accident reports. It also conducted a surveillance of the law office and chiropractic clinic. The surveillance revealed that many of the participants in the staged accidents resided at the same apartment. Approximately ten Hispanics were photographed entering and exiting the apartment. By watching the apartment the task force identified participants who were going to the two offices.
Rives testified that the accidents began concurrently with the opening of the law office in November 1995. The accidents were suspicious because they all fit the pattern of what the insurance industry calls a “swoop and squat” accident. According to *1195 Rives, a “swoop and squat” accident usually occurs on a four-lane highway. The “swoop vehicle” positions itself in one of the lanes, directly ahead of the “squat vehicle.” The “target vehicle” is some unsuspecting motorist who is driving behind the squat vehicle. A “trap vehicle” is positioned next to the “target vehicle,” thus blocking the unsuspecting motorist’s ability to move into the second lane of traffic. He stated that the purpose of the prearranged collision is to induce the driver of the “target vehicle” into believing that the vehicle at fault was the “swoop vehicle,” which drives away from the scene of the accident.
Rives also stated he found it suspicious that the law firm had 75 clients in January 1996 although it had only opened in November 1995. Further, the law firm did not advertise, have a sign designating the location as a law firm, nor have a listing in the telephone directory. In December 1995. the West Esplanade Treatment Center opened and the firm referred all of its clients to this center. Later, the firm began referring clients to other attorneys when the investigation continued.
Rives stated he also received information from Mercedes Morera-Baughman (Morera-Baughman), the former paralegal of the law firm, who provided him with information of clients. In addition the FBI used a confidential informant who was actually recruited and who participated in a staged accident. The confidential informant was sent to the law firm which then referred the informant to the center. Six recruiters of the scheme were arrested. One of the recruiters provided the task force with information leading to the arrests in Diaz’ case. Thejsdriver of the “trap vehicle” for the Diaz-Avengno accident was convicted. That driver also provided the task force with information about the scheme.
Rives stated search warrants were obtained for the law firm and the center. The claimants were located from accident reports and subsequently interviewed. After the interviews arrest warrants were obtained.
He stated that in the Diaz-Avengno accident, Diaz was driving the “squat vehicle.” Georgina Rubio was in the front passenger seat of the Diaz vehicle and Oriel Bemabeu was in the back seat with Ricardo Menez Vega.
On cross examination he explained that the investigation started with the State Farm agent’s own investigation of a developing pattern from the claims the agent processed. This agent actually went to the law firm to interview people. Rives was uncertain regarding the specific information provided by Morera-Baughman. He did not know whether she supplied information from memory or whether she gave a report. He stated he did not see any attorney files from the law firm until after the firm was served with the search warrant.
Morera-Baughman testified without objection at trial as follows. She was employed by Ronald Gurley, an attorney for the law firm. The firm was a branch of a California firm. The local administrator was Michael Shift-man. The job required her to speak Spanish since the Latino community was targeted as the client population. She was hired in November 1995.
Morera-Baughman’s job involved functioning as a receptionist and as a paralegal. The clients were only referred to the center. Within a short period of time the firm had sixty to seventy clients although there was no advertisement.
Morera-Baughman noticed that all of the accidents involved rear-end collisions and that the clients seemed to know each other. She stated that in February 1996 two individuals from the insurance company came to check out' the office. She believed these were State Farm Insurance representatives. Her supervisor, Shiftman, was upset at their unannounced arrival.
She stated she was uncertain as to when she expressed her concerns to someone outside the office but that “after several months of seeing what was going on” she spoke to a State Farm Insurance representative explaining that someone needed to look at this situation more closely. She also “volunteered” her services. She reviewed the accident reports and gave the information to “the proper individuals.” She also gave police reports to “several individuals with law *1196 | (¡enforcement organizations.” ■ No investigator ever asked her to take client files from the office.
On cross examination she was asked whether she recalled Diaz coming to the law firm. She replied he did come to the office several times.
Rebecca Andrews (Andrews), a claims handler for Progressive Insurance, testified she handled insurance claims for both property damage and for personal injury that were filed by the law firm in January of 1996 on behalf of the defendant. Diaz was paid $1,200 by Progressive for damage tó his vehicle. However, Diaz’ personal injury claim was denied by the insurance company. Andrews explained that the property damage claim was paid immediately, before the investigation into the accident began. Andrews was familiar with the firm since she had claims pending with several of the clients. She further testified that all of the firm’s clients were Hispanic.
She testified that the company’s investigative unit, which investigates claims thought to be dishonest, was involved in the processing of the defendant’s claim from the beginning. She also stated that everyone riding in the car with the defendant at the time of the accident filed a claim with her company. Andrews noted that the only personal contact that she had with the defendant occurred when the defendant came to her office with a new, second attorney. She knew that the defendant had retained a second attorney sometime in April of 1996, but- she was unaware as . to the reason for the defendant’s change in legal representation.
Oriel Bemabeu (Bemabeu), a passenger in the Diaz’ vehicle, gave a statement on June 11,1996 to Rives regarding the incident. On cross examination defense counsel questioned Bernabeu regarding the statement. The statement was later introduced into evidence over defense counsel’s objection. The trial judge correctly stated that it was defense counsel who first brought the statement at issue and that by doing so he opened the door to further questioning by the state as well as to its introduction.
The statement recites that Bernabeu had been contacted by Diaz who urged him to be a passenger in a staged accident. However, at trial Bemabeu testified he did not recall giving that statement. He admitted he had a ‘Vague” idea something was going on.
Rives testified Bernabeu signed the written statement and did not disagree at that time with its accuracy.
The defense called Dr. Bernard Manale, an expert in orthopedic medicine, to testify. The ^doctor testified that he first treated the defendant on May 1, 1996, and that he saw the defendant five times after the initial meeting. He diagnosed the defendant with sprains to the neck and the back areas, explaining that such injuries are called soft tissue injuries and can occur in a low-impact car collision. Although the defendant told the doctor that his injuries were the result of a car accident that occurred on January 5, 1996, the doctor had no idea whether or not the accident was a staged accident. When asked whether a person could stage an accident wherein he would not be hurt, the doctor testified that “[i]t doesn’t mean anything one way or the other. They could be lucky or unlucky.”
MOTIONS TO QUASH AND TO SUPPRESS THE EVIDENCE
As noted previously the trial judge never ruled on the motion to suppress evidence after the state informed the court it would not introduce any physical evidence or any statements made by Diaz. Thus, the issue became moot and defense counsel chose not to respond to the motion at that point. With regard to the motion to quash, we note that the defendant argues that all of the evidence used against him was obtained from an illegal seizure of the law firm and center, and that the information should be quashed. The defendant argued that all evidence was obtained directly or indirectly through Mor-era-Baughman in violation of an attorney-client privilege.
The trial judge asked defense counsel if he was in a posture to represent the attorneys or any of the parties who were able to assert an attorney-client privilege. Defense counsel stated he was not in that posture. The trial judge explained that the privilege had to be *1197 asserted by the parties to whom it applied. He stated that counsel must first show the privilege was available for him to assert.
Defense counsel then argued that Diaz was a client of the firm. The trial judge asked counsel if Diaz’ file was taken. Defense counsel stated he was not- in a position to have that information. He stated the case began based on a breach of the attorney-client privilege!
The state responded that counsel did not state a reason in support of the motion to quash. Counsel argued that the offense was not committed since the evidence was based on privileged information. The court denied the motion to quash. However, the trial judge found that there was no showing that any of the material he was concerned with was a privilege which might be asserted by Diaz. He also stated:
there is an appropriate time for where there’s an offer of material 1gthat a prejudice can be asserted. This certainly is not that time, but I do not find you’ve met any of the' requirements under the code of criminal procedure where the court should quash the bill of information. I deny that motion.
Thus, the court allowed defense counsel the opportunity during trial to object to the introduction of any privileged document. The only document defense counsel objected to was Bernabeu’s statement discussed above; however, it was defense counsel who opened the door to its introduction. La. C.E. art. 611(E) provides:
The plaintiff in a civil case and the state in a criminal prosecution shall have the right to rebut evidence adduced by their opponents.
Furthermore, in State v. Barnes, 245 So.2d 159, 163, 257 La. 1017 (1970), appeal dismissed, cert. denied, 404 U.S. 931, 92 S.Ct. 289, 30 L.Ed.2d 244 (1971), the Louisiana Supreme Court held:
a motion to quash the indictment is not a proper remedy for an unconstitutional search and seizure. See LSA-C.Cr.P. Arts. 531-534.
Accord, United States v. Morrison, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981).
Diaz also complains the trial judge erred by refusing to conduct an evidentiary hearing pursuant to Bright, supra. In Bright the state sought the production of defendant’s diary from defense counsel. The defendant moved to quash the subpoena on the grounds the diary was privileged material and its production would violate the attorney-client privilege. The case is inapplicable since there has been no showing by the defendant in the instant ease of a privileged communication between the defendant and his attorney which was used at trial. Furthermore, the trial judge allowed defense counsel to raise an objection to such material if necessary at trial.
We also note the evidence shows that the investigation into the staged accidents began as a result of a state farm agent’s initial investigation and his noting a pattern. The investigation did not arise as the result of Morera-Baughman’s volunteering her assistance to the authorities. Furthermore, the documents she gave to the investigators were accident reports, none of which were introduced at trial. Additionally, the information leading to Diaz’ arrest was gathered from other sources including the assistance of other participants in the scheme.
INSUFFICIENCY OF EVIDENCE
The defendant claims that the state failed to demonstrate that he had the requisite intent to injure, defraud, or deceive the insurance company. He also claims that he did not | ¡¡present false or fraudulent claims to an insurance company. Finally, the defendant claims that the state did not prove that he violated LSA-R.S. 22:1243 [3] in that he did not violate 22:1243(A)(1).
*1198 Initially, it should be noted that the state filed a bill of information against the defendant alleging that he violated La.R.S. 22:1244(A)(1), infra. The defendant was convicted as charged. Therefore, the state did not have to prove that the defendant violated La. R.S. 22:1243.
Moreover, the state offered ample evidence that the defendant had the requisite intent to injure, defraud, and/or deceive Progressive Insurance Company. The state presented the testimony of Mr. Bernabeu. Although during the trial Bernabeu denied ever telling investigators that the defendant had telephoned him and asked him to participate in a staged accident, the state introduced Bema-beu’s statement into evidence at trial. The jury was allowed to review this statement. This statement reflects that Bernabeu told investigators that the defendant called Ber-nabeu and asked him to participate in a staged accident. It further reveals that Diaz explained to Bernabeu he would be paid $2,000 to $2,500 by an attorney for his involvement in the accident. Bernabeu also stated Diaz explained he would have to see a doctor, who was already lined up for him to see. Bernabeu stated he participated in the staged accident at issue.
The defendant argues that his claims for property damage and personal injury were legitimate and as such show he lacked the requisite intent to defraud. We disagree based on a clear reading of the statute. -
La.R.S. 22:1244(1) requires that Diaz “(1) Knowingly cause[d] or participate[d]- in a | ipvehicular collision, or any other vehicular accident, for the purpose of presenting any false or fraudulent claim.” [Emphasis added.]
EXCESSIVENESS OF SENTENCE
The defendant complains that his sentence of three years imprisonment at hard labor is excessive.
•La.R.S. 22:1244 provides that anyone convicted pursuant to this statute “is guilty of a felony and shall be subjected to a term of imprisonment, with or without hard labor, not to exceed five years or a fine not to exceed five .thousand dollars, or both.” Therefore, the defendant received below the maximum term of imprisonment provided for in the statute. Furthermore, the trial court did not impose a fine upon the defendant.
Diaz argues the following:
[he had] no prior convictions, was one defendant of twenty persons charged, and was only named in one count; however, he was the only defendant to be sentenced to jail. The trial court did not order a pre-sentence investigation. Appellant’s actions in this matter fail to show the need for correctional treatment or a risk of committing additional crimes if his sentence was suspended or less harsh. The court considered that appellant was a risk to other citizens, but no facts support this.
Defense counsel stated for the record that Diaz has an 11-year-old son and that he had been offered probation if he pled guilty. The trial judge stated he would not be influenced by Diaz’ declining the plea bargain. Counsel stated he had nothing else to offer.
The trial judge stated:
In imposing sentence, the Court has taken into consideration the provisions of the Code of Criminal procedure Article 894.1 and, further, the Court has taken into consideration the following aggravating and mitigating factors.
First, the Court takes notice that the defendant has been convicted of a felony.
Further, the Court is of the opinion that there is an undue risk that during the period of a suspended sentence, if such *1199 were imposed in this case, that this defendant would likely commit additional crimes. The Court is of the opinion that the defendant is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution under the control of the State of Louisiana. A lesser sentence than that, would deprecate the seriousness of the defendant’s crime.
The Court further takes into consideration that the defendant was offered, in connection with his conduct attempted to receive something of value in that the matter involved insurance fraud and the conducting of faking an automobile accident for the purpose of receiving something of value from the insurance company. The | ii Court is of the opinion and has taken into consideration that the incidents created various automobile accident [sic] which was, the automobile accident created a risk of death or great bodily harm to persons who were on the highways of this parish.
We find no abuse of the trial court’s wide discretion to sentence within statutory limits. See State v. Lassere, 95-1009 (La.App, 5th Cir. 10/1/96), 683 So.2d 812, writ denied, 96-2655 (La.4/18/97), 692 So.2d 445.
We have also examined the' record for errors patent and have found none.
Accordingly, for the reasons stated, the conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.

. La.R.S.22:1244 provides:
A. Any person who with an intent to injure, defraud, or deceive any insurance company:
(1) Knowingly causes or participates in a vehicular collision, or any other vehicular accident, for the purpose of presenting any false or fraudulent claim;
(2) Knowingly presents or causes to be presented multiple claims for the same loss or injury, including presentation of multiple claims to more than one insurer, with an intent to defraud; or
(3) Engages in any of the actions or activities described in R.S. 22:1243, relative to insurance policies in general; is guilty of a felony and shall be subjected to a term of imprisonment, with or without hard labor, not to exceed five years or a fine not to exceed five thousand dollars, or both.
B. The criminal provisions of this Section shall be investigated, enforced, or prosecuted only by the proper law enforcement and prose-cutorial agencies.

. La.Code Crim. P. Art. 531 provides:
All pleas or defenses raised before trial, other than mental incapacity to proceed, or pleas of "not guilty” and of "not guilty and not guilty by reason of insanity,” shall be urged by a motion to quash.
La.Code Crim. Proc. Art. 532 provides the general grounds upon which a motion to quash may be based as follows:
A motion to quash may be based on one or more of the following grounds:
(1)The indictment fails to charge an offense which is punishable under a valid statute.
(2) The indictment fails to conform to the requirements of Chapters 1 and 2 of Title XIII. In such case the court may permit the district attorney to amend the indictment to correct the defect.
(3) The indictment is duplicitous or contains a misjoinder of defendants or offenses. In such case the court may permit the district attorney to sever the indictment into separate counts or separate indictments.
(4) The district attorney failed to furnish a sufficient bill of particulars when ordered to do so by the court. In such case the court may overrule the motion if a sufficient bill of particulars is furnished within the delay fixed by the court.
(5) A bill of particulars has shown a ground for quashing the indictment under Article 485.
(6) Trial for the offense charged would constitute double jeopardy.
(7) The time limitation for the institution of prosecution or for the commencement of trial has expired.
(8) The court has no jurisdiction of the offense charged.
(9) The general venire or the petit jury venire was improperly drawn, selected, or constituted.
La.Code Crim. Proc. Art. 534 provides the special grounds upon which a motion to quash a bill of information may be based:
A motion to quash an information may also be based on one or more of the following grounds:
(1) The information was not signed by the district attorney; or was not properly filed.
(2) The offense is not one for which prosecution can be instituted by an information.

. La. R.S. 22:1243 provides as follows:
A. Any person who, with the intent to injure, defraud, or deceive any insurance company, or any insured or other party in interest, or any third party claimant:
(l) Presents or causes to be presented any written or oral statement including computer-generated documents as part of or in support of or denial of a claim for payment or other benefit pursuant to an insurance policy, knowing that such statement contains any false, incomplete, or fraudulent information concerning any fact or thing material to such claim; or
*1198 (2) Assists, abets, solicits, or conspires with another to prepare or make any written or oral statement that is intended to be presented to any insurance company, insured, or other party in interest or third party claimant in connection with, or in support of or denial, or any claim for payment of other benefit pursuant to an insurance policy, knowing that such statement contains any false, incomplete, or fraudulent information concerning any fact or thing material to such claim; is guilty of a felony and shall be subjected to a term of imprisonment, with or without hard labor, not to exceed five years, or a fine not to exceed five thousand dollars, or both, on each count.
B. The criminal provisions of this Section shall be investigated, enforced, or prosecuted only by the proper law enforcement and prose-cutorial agencies.